**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

<table>
<tr>
<td>

**TERRY L. WEISS,**

      Plaintiff**,**

    vs.

**CITY OF SANTA ROSA POLICE DEPARTMENT, ET AL.,**

      Defendants**.**

</td>
<td>

CASE NO.  15-cv-01639-YGR

**ORDER RE: CITY DEFENDANTS' MOTIONS TO DISMISS, FOR JUDGMENT ON THE PLEADINGS, AND FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 137, 145, 148

</td>
</tr>
</table>

The instant case stems from an incident at a Comcast retail store which took place on July 24, 2013.  Plaintiff Terry L. Weiss and approximately 45 other customers were present at the store after closing time, so the store manager called the police to help vacate the premises in order to prevent customer protests.  Plaintiff subsequently sought to obtain a copy of the police report regarding the Comcast incident.  Plaintiff's claims alleged arise from the events which took place during her ensuing visit to the police station and are asserted against the City of Santa Rosa (erroneously sued as "City of Santa Rosa Police Department") (the "City"), former Chief to the Santa Rosa Police Department ("SRPD") Tom Schwedhelm, former SRPD Sergeant Andrew Romero, and Officers John Deadman, Kaiden Kemp, and Pat Gillette (the "Officer Defendants") (together, the "City Defendants").[1]

Pending before the Court are the following motions filed by the City Defendants: (1) a motion to dismiss or, in the alternative, renewal of the City Defendants' motion to determine plaintiff's competency (Dkt. No. 137 ("Motion to Dismiss" or "MTD")); (2) a motion for judgment on the pleadings (Dkt. No. 145 ("Motion for Judgment on the Pleadings" or "MJP"));

---

[1]  The Officer Defendants and Schwedhelm are referred to herein collectively as the "Individual City Defendants."

United States District Court
Northern District of California

and (3) a motion for summary judgment or, in the alternative, partial summary judgment (Dkt. No. 148 ("Motion for Summary Judgment" or "MSJ")). Having carefully considered the papers submitted, the admissible evidence, and the pleadings in this action, and for the reasons set forth below, the Court **ORDERS** as follows: The Motion to Dismiss is **DENIED**,[2] the Motion for Summary Judgment is **GRANTED** as to plaintiff's 42 U.S.C. section 1983 (herein "Section 1983") claim against the City, Officer Deadman, and Sgt. Romero, and the Motion for Judgment on the Pleadings is **GRANTED** as to all remaining claims.

## I.    EVIDENTIARY ISSUES

Here, although plaintiff's various filings challenge the truth of many of the facts asserted in the City Defendants' Motion for Summary Judgment, plaintiff has not pointed to any competent evidence to demonstrate that there is a triable dispute. Plaintiff was duly advised of her obligations, (*see* Dkt. No. 155 ("*Rand* Notice")),[3] and was provided multiple opportunities to sit

---

[2] In light of the evidence now before the Court and plaintiff's *pro se* status, the Court declines to dispose of the action on procedural grounds, namely, plaintiff's purported "fail[ure] to sit for deposition and answer all questions pertaining to the remaining allegations in her third amended complaint ['TAC']." (MTD at 1 (internal quotation marks omitted).) The Court also declines the City Defendants' alternative request that the Court determine plaintiff's competency and appoint a guardian *ad litem* for plaintiff. (*See* Dkt. No. 122; MTD at 10–11.) In light of the procedural posture of this case and City Defendants' failure to file any Rule 12(b)(6) motion to dismiss, the Court views the City Defendants' repeated requests on the matter as blind to the potential consequences of such a finding outside the context of this lawsuit. That plaintiff's version of the underlying events has remained largely consistent throughout the course of the litigation weighs against a finding of incompetence. (*Compare, e.g.*, Dkt. No. 1-1 ("Compl.") at ECF p. 7, *with* Dkt. No. 76 ("TAC") at ¶¶ 48–54 *and* Transcript of the Deposition of Terry L. Weiss ("Weiss Depo Tr.") at 102:22–152:24, Dkt. No. 167-1.) Indeed, plaintiff herself indicates that she is "no[t] incompetent – [rather,] she is quite aware of her surroundings, (almost too much), and the ability to understand what is going on and respond." (Dkt. No. 163 ("MSJ Opp. Pt. 1") at 6.) In any event, while plaintiff herself acknowledges mental health concerns, a finding of incompetence would extend too far.

As for the City Defendants' corresponding request for judicial notice (Dkt. No. 138), the Court need not take judicial notice of documents on this case's docket. The request is thus **DENIED**.

[3] The City Defendants' *Rand* Notice informed plaintiff of the following:

To oppose a motion for summary judgment, you must show proof of your claims. To do this, you may refer to specific statements made in your complaint if you signed your complaint under penalty of perjury and if your complaint shows that you have personal knowledge of the matters stated. You may also submit declarations setting forth the facts that you believe prove your claims, as long as the person who signs the declaration has personal knowledge of the facts stated. You

2

for deposition.[4]  Plaintiff submitted no written declaration stating the factual basis that supports her claims.[5]

However, given plaintiff's status as a *pro se* litigant and the Court's independent duty to evaluate the case fairly, the Court ordered the City Defendants to produce the entirety of plaintiff's deposition transcript and all corresponding exhibits.  (*See* Dkt. No. 164 at 2; *see also* Weiss Depo Tr.)  The Court has taken into consideration plaintiff's deposition testimony in determining whether there exists any genuine issue for trial and given her all due consideration.[6]

## II.    RELEVANT BACKGROUND

### A.    Factual Background

The following facts are not subject to reasonable dispute:

On the evening of July 24, 2013, plaintiff visited the SRPD station to obtain a police report

---

may also submit all or part of deposition transcripts, answers to interrogatories, admissions and other authenticated documents.  For each of the facts listed in the defendant's Statement of Undisputed Material Facts Supporting the Evidence, you must admit the facts that are undisputed, and deny the facts that are disputed.  If you deny a fact, you must cite to the proof that you rely on to support your denial.  If you fail to contradict the defendant's evidence with your own evidence, the court may accept the defendant's evidence as the truth and grant the motion.

(*Rand* Notice at 2–3.)

[4]  According to the City Defendants, they re-noticed plaintiff's deposition seven times. (*See* MTD at 2.)

[5]  Though plaintiff has not filed a responsive statement of facts as is required by this Court's Standing Order in Civil Cases, she addresses through briefing the "issues" to which the City Defendants' facts in their supporting separate statement relate.  (*See* Dkt. No. 163-1 ("MSJ Opp. Pt. 2") at 2, 12; Dkt. No. 172-1 ("MSJ Suppl. Opp. Pt. 2") at 6–25.)

[6]  During plaintiff's deposition, defense counsel moved numerous times to strike plaintiff's deposition testimony.  Such motions are globally **DENIED**.

In addition, for plaintiff's benefit, the Court addresses her apparent confusion regarding her entitlement to legal fees.  (*See* Weiss Depo Tr. at 169:23–170:3.)  Specifically, plaintiff insists that she has a "right to legal fees."  (*Id.* at 170:6–7.)  However, it is well settled that *pro se* litigants are not entitled to recover legal fees.  *See Kay v. Ehrler*, 499 U.S. 432, 435 (1991) ("[A] *pro se* litigant who is *not* a lawyer is *not* entitled to attorney's fees.") (emphases in original); *Elwood v. Drescher*, 456 F.3d 943, 947 (9th Cir. 2006) ("[T]he *Kay* opinion . . . appears to deny attorneys' fees generally to *all* pro se litigants, including pro se litigants who are attorneys.") (emphasis supplied); *Gonzalez v. Kangas*, 814 F.2d 1411, 1411–12 (9th Cir. 1987) (denying pro se prisoner's motion for attorney fees for his time spent litigating his *pro se* civil rights action).

regarding the incident which took place earlier that day at the Comcast retail store and to speak to the officers involved in the incident. While the SRPD lobby is not staffed after 7:00 p.m., it is open to the public. (Declaration of Andrew Romero ISO MSJ ("Romero Decl.") ¶ 6, Dkt. No. 150.)

On the front counter of the lobby, a telephone connects the dialer directly to the SRPD Dispatch Center. (*Id.*) The Dispatch Center is staffed by 911 call-takers who receive 911 "calls for service" and then transmit information to dispatchers who in turn transmit information to the appropriate first responders. (*Id.* ¶ 4.) 911 calls and the Dispatch Center are not intended for routine, non-emergency police issues. (*Id.*)[7]

At approximately 10:32 p.m., plaintiff placed a call from the lobby to the Dispatch Center, which lasted more than five minutes. (Petri Decl. ¶ 9.) Sgt. Romero, who was the assigned Watch Commander on duty at the SRPD station, was subsequently informed that a 911 call-taker had a call from plaintiff from the lobby phone and that plaintiff wanted to speak with the officers involved in the earlier Comcast incident. (Romero Decl. ¶¶ 4, 8.)[8]

Sgt. Romero was dispatched to the lobby and listened to plaintiff for over 11 minutes, who again demanded to speak to the officers involved in the Comcast incident. (*Id.* ¶¶ 9, 12.) In that time, Sgt. Romero told plaintiff she could tell him her side of the Comcast story and that he would relay the information to the officers because he was their immediate supervisor. (*Id.* ¶ 12.) Plaintiff rambled on about Comcast and the problems she was having with it and said she would not leave until she spoke to the officers. (*Id.*) Sgt. Romero told plaintiff she would have to wait

---

[7] The lobby events described herein were captured by the three ceiling-mounted surveillance cameras installed at the SRPD. (Declaration of Jerry Petri ISO MSJ ("Petri Decl.") ¶ 5, Dkt. No. 149.) The feeds from the three cameras are referred to herein as "Police fl1 CO1," "Police fl1 CO2," and "Police fl1 CO4." (*See id.* ¶ 9.) The video footage provided to the Court does not have audio, and according to the City Defendants no audio recording exists. (*Id.*) Plaintiff alleges that portions of the video evidence have been deleted but presents no evidence from which the accuracy of the video recordings could reasonably be doubted. She also asserts that Officer Deadman turned off his body camera after entering the SRPD lobby. However, the actual footage from the surveillance cameras does not support her assertion. Indeed, plaintiff has failed to establish that any body camera or any body camera footage ever existed.

[8] As the Watch Commander, Sgt. Romero had the authority to "revoke the permission" of a member of the public to be present in the lobby of the police station for causing a disruption to police operations including the Dispatch Center. (Romero Decl. ¶ 7.)

and that the officers would be in when time permitted.  (*Id*.)  He then left the lobby.  (*Id*.)

Less than ten seconds after Sgt. Romero told plaintiff she could wait for the officers to become available, plaintiff picked up the counter phone and called the Dispatch Center again, at approximately 10:52 p.m.  (Petri. Decl. ¶ 9.)  This second call lasted just over five minutes.  (*Id*.)  Approximately 28 minutes later, at 11:25 p.m., plaintiff picked up the counter phone and called the Dispatch Center for a third time.  This call lasted just over one minute.  (*Id*.)

Approximately 11 minutes after this third call, Dispatch contacted Sgt. Romero again and told him that plaintiff was repeatedly calling from the lobby and demanding that officers come speak to her.  (Romero Decl. ¶ 14.)  Because Officer Deadman was coming in the back door at the time, Sgt. Romero directed Officer Deadman to accompany him to the lobby so that plaintiff could tell him her side of the Comcast story and come to a resolution.  (*Id*. ¶ 14.)

Upon arriving at the lobby, Sgt. Romero and Officer Deadman stopped six to eight feet from plaintiff, who was seated.  (*Id*. ¶ 15; *see also* Police fl1 CO4 at 23:37:29.)  Plaintiff refused to speak to them until all of the officers involved in the Comcast incident were present.  (Romero Decl. ¶ 15.)  Sgt. Romero told plaintiff that Officer Deadman was present to hear whatever plaintiff had to say, but plaintiff still refused to speak.  (*Id*. ¶¶ 15, 16.)

Plaintiff then sprang from her seat and darted past Sgt. Romero and Officer Deadman towards the counter phone.  (*Id*. ¶ 19; *see also* Police fl1 CO4 at 23:37:32–4.)  Sgt. Romero attempted to remove the phone from plaintiff's hand and take her into custody.  (Romero Decl. ¶ 20; *see also* Police fl1 CO2 at 23:37:35.)  Plaintiff resisted Sgt. Romero, pulled away from him, and moved several feet away.  (Romero Decl. ¶ 21; *see also* Police fl1 CO4 at 23:37:36.)  She continued to resist and pulled completely free from Sgt. Romero's hands, turned to face him, and continued to move away from Sgt. Romero.  (Romero Decl. ¶ 22; *see also* Police fl1 CO2 at 23:37:37.)  Sgt. Romero grabbed plaintiff's right wrist with his left hand as she continued to pull away from him, and Officer Deadman grasped her right shoulder.  (Romero Decl. ¶ 23; *see also* Police fl1 CO2 at 23:37:37.)  Officer Deadman handcuffed plaintiff and conducted a pat search. (Romero Decl. ¶ 24.)

Maintaining a firm grip on plaintiff's upper arms, Sgt. Romero and Officer Deadman then

walked plaintiff towards the parking lot. (*Id.* ¶¶ 25, 26; *see also* Police fl1 CO4 at 23:38:59.) Sgt.

Romero directed Officer Deadman and his trainee Officer Kemp to transport plaintiff to the Main

Adult Detention Facility ("MADF"). (Romero Decl. ¶ 27.) At the MADF, Officer Deadman

observed a correctional officer conduct an examination of plaintiff and take a booking photograph.

(Declaration of John Deadman ISO MSJ ("Deadman Decl.") ¶ 17, Dkt. No. 153.) He was advised

that plaintiff would be admitted to the MADF without necessity of a medical clearance. (*Id.*)

Correctional Deputy 2 Francisco Flores ("CD Flores"), who was employed at the MADF

and whose job duties included processing individuals that were arrested and processed into

booking, objectively assessed plaintiff and marked the Arrest Report Form as follows:

| | | |
|---|---|---|
| 1. | Is the arrestee unable to walk under his own power? | No |
| 2. | Is significant external bleeding visible?<br>(*Look for signs of blood on clothing or body*) | No |
| 3. | Are bone fractures visible? | No. |
| 4. | Are there visible or obvious symptoms of a head injury?<br>(*Look for bleeding from ears, nose, mouth or head;<br>swelling, bruising, dizziness, disorientation, or confusion*) | No. |
| . . . | | |
| 7. | Is the arrestee complaining of or demonstrating symptoms<br>of severe pain or trauma or other serious injuries or<br>illnesses? | No. |
| . . . | | |

IF ARRESTEE DISPLAYS ANY OF THE ABOVE, THE ARRESTING/
TRANSPORTING OFFICER IS REQUIRED TO TAKE THE INDIVIDUAL TO AN
EMERGENCY MEDICAL FACILITY FOR EVALUATION, EXAMINATION, AND
TREATMENT AS NECESSARY. CORRECTIONAL STAFF WILL NOT ACCEPT
THE ARRESTEE INTO CUSTODY WITHOUT A MEDICAL CLEARANCE FROM
THE HOSPITAL.

(*See* Transcript of Deposition of Francisco Flores ("Flores Depo Tr.") at 10:15–11:4, 32:12–34:1,

Dkt. No. 175-1[9]; *see also* Declaration of John J. Fritsch ISO MSJ Exh. H at ECF p. 27 ("Arrest

---

[9] Again, given plaintiff's *pro se* status, the Court ordered the City Defendants to file the
entirety of CD Flores' deposition transcript so that it could evaluate the testimony independently,
including plaintiff's own examination of the witness. (*See* Dkt. Nos. 174, 175.)

Report Form"), Dkt. No. 151-1.)

## B.    Procedural Background

On January 28, 2014, the City received plaintiff's "Claim Against the City of Santa Rosa."[10] (Declaration of John J. Fritsch ISO MJP ("Fritsch Decl. ISO MJP") Exh. A, Dkt. No. 146-1 at ECF pp. 1–8.)  The claim identifies the following "public employee(s) causing the injury . . . : S.R.P.D. police officers: (1) Sgt. Romero . . . [,] (2) John Deadman . . . [,] (3) Kaden Kemp . . . [,] [and] (4) Pat Gillette . . . ."  (*Id*. at ECF p. 3.)  Plaintiff claimed "Total Damages to Date: $ 92,800.00+."  (*Id*.)  On March 14, 2014, the City mailed its "Notice of Rejection of Claim" to plaintiff.  (Fritsch Decl. ISO MJP Exh. B ("Rejection"), Dkt. No. 146-1 at ECF pp. 9–11.)  In part, the notice advised that plaintiff's claim was rejected on March 14, 2014 and provided the following "warning": "SUBJECT TO CERTAIN EXCEPTIONS, YOU HAVE ONLY SIX (6) MONTHS FROM THE DATE THIS NOTICE WAS PERSONALLY DELIVERED OR DEPOSITED IN THE MAIL TO FILE A COURT ACTION ON YOUR STATE LAW CLAIMS. SEE GOVERNMENT CODE §945.6."  (*Id*. at ECF p. 10.)

Approximately six months later, on September 12, 2014, plaintiff filed a civil complaint styled "Weiss v. Santa Rosa Police Department" in the Superior Court for the State of California, County of Sonoma (the "Superior Court").  (*See* Compl.)  The sole defendant was "Santa Rosa Police Dept," and the sole cause of action was "General Negligence."  (*Id*. at ECF pp. 2, 6.)

On March 30, 2015, plaintiff filed a first amended complaint in the Superior Court, which again named the SRPD, and additionally Schwedhelm, Deadman, Kemp, and Romero as defendants.  (*See* Dkt. No. 1-2 ("FAC").)  The FAC asserted, *inter alia*, various state law tort causes of action including "negligence."  (*See generally id*.)  The action was subsequently removed to this Court on April 10, 2015 (Dkt. No. 1), and plaintiff thereafter moved to file a second amended complaint on November 19, 2015 (Dkt. No. 23).

---

[10]  In connection with their Motion for Judgment on the Pleadings, the City Defendants ask the Court to take judicial notice of six "items."  (Dkt. No. 147.)  Their unopposed request is **GRANTED** as to item numbers 2 and 3 but **DENIED** as to item numbers 1 and 4–6 since the Court need not take judicial notice of documents on this case's docket.  In the same vein, the City Defendant's request for judicial notice at Docket Number 169 is **DENIED**.

7

Plaintiff filed her second amended complaint on December 15, 2015, which added Officer Gillette, and the Sonoma County Sheriff's Office (erroneously sued as "Sonoma County Sheriff's Department") and the County of Sonoma (erroneously sued as the "Main Adult Detention Facility") (the "County Defendants") as defendants. (Dkt. No. 26 ("SAC").) On April 11, 2016, the County Defendants moved to dismiss all claims alleged against them in the SAC, (Dkt. No. 39), to which plaintiff failed to respond timely on April 25, 2016, (*see* Dkt. No. 48). The Court then extended plaintiff's response deadline to May 13, 2016. (Dkt. No. 50.) After all briefing on County Defendants' motion was submitted, the Court granted the motion on July 5, 2016, dismissing plaintiff's claims under 42 U.S.C. sections 1983 and 1985 with leave to amend and plaintiff's state law claims with prejudice. (*See generally* Dkt. No. 72.) The Court gave plaintiff 45 days to file an amended complaint. (*Id*. at 8.) A few days before her filing deadline, plaintiff moved for an extension of time. (Dkt. No. 74.) Because the County Defendants did not oppose the motion, and for good cause shown, the Court granted plaintiff's motion and gave her until September 19, 2016 to file her amended complaint. (Dkt. No. 75.)

Plaintiff timely filed the operative TAC, which again alleged violations of Sections 1983 and 1985 and added Sheriff Steve Freitas and County Supervisor Efren Carrillo as new County Defendants. On September 30, 2016, the County Defendants moved to dismiss plaintiff's claims against them, (Dkt. No. 77), to which plaintiff failed to respond timely on October 14, 2016, (*see* Dkt. No. 80). Plaintiff subsequently requested an extension of time to file her response, (Dkt. No. 81), which this Court granted "[i]n the interest of justice," (Dkt. No. 83.) However, the Court noted that it would "not grant any further requests for extensions from plaintiff, absent a compelling reason for such request." (Dkt. No. 83.) After all briefing on the County Defendants' motion was submitted, the Court granted the County Defendants' motion with prejudice, finding plaintiff had made no showing that she would otherwise be able to plead facts adequate to sustain a Section 1983 or Section 1985 claim against the County Defendants. (Dkt. No. 86.)[11]

---

[11] Plaintiff subsequently appealed the Court's order. (*See* Dkt. No. 88.) The Ninth Circuit determined the order was not final or appealable and thus dismissed the appeal for lack of jurisdiction. (Dkt. No. 91.)

The City Defendants filed the instant Motion to Dismiss on May 16, 2018, to which plaintiff failed to respond timely on May 30, 2018. (*See* Dkt. No. 143.) Without requesting an extension of time from the Court, plaintiff filed her response on June 11, 2018. Both the Motion for Judgment on the Pleadings and Motion for Summary Judgment were subsequently filed on June 18, 2018. On July 23, 2018, three weeks after plaintiffs' responses were due, plaintiff filed a motion to continue her response deadline to August 1, 2018. (Dkt. No. 160.) Despite this extension, which the Court granted, plaintiff did not file her response until August 27, 2018. In her response, plaintiff indicated that she would be "upgrading her answers and completing new ones weekly until fully answered, or if the Court order[ed] [p]laintiff to stop." (MSJ Opp. Pt. 1 at 2.) "In light of the numerous extensions the Court has provided to plaintiff throughout the course of the litigation and plaintiff's failure to meet various deadlines, . . . and for the sake of preserving judicial economy and avoiding further prejudice to the City Defendants," the Court prohibited plaintiff from filing additional responses on a weekly basis. (Dkt. No. 164 at 1.) However, "in the interest of justice and given the procedural posture of the case," the Court allowed plaintiff to make one more update to her response, to be postmarked by no later than September 4, 2018. (*Id.*) While plaintiff's updated response appears to have been postmarked on such date, the Court did not receive it until September 21, 2018.[12]

---

[12] Also before the Court are various requests by plaintiff to have counsel appointed for her. (*See, e.g.*, MSJ Opp. Pt. 1; MSJ Suppl. Opp. Pt. 2; *see also, e.g.*, Dkt. Nos. 144 ("MTD Opp."), 172 ("MSJ Suppl. Opp. Pt. 1").) As the Court has explained to plaintiff in the past (*see, e.g.*, Dkt. Nos. 68, 129), and as plaintiff herself acknowledges (*see* MSJ Opp. Pt. 1 at 8), the law does not provide for the right to counsel in civil cases for *pro se* plaintiffs. *See United States v. 30.64 Acres of Land*, 795 F.2d 796, 801 (9th Cir. 1986) ("There is normally . . . no constitutional right to counsel in a civil case[.]"); *see also, e.g.*, *Morris v. Barr*, No. 10-CV-2642-AJB (BGS), 2011 WL 3859711, at *3 (S.D. Cal. Aug. 31, 2011) ("Plaintiff's arguments regarding his ability to obtain discovery, the potential need for experts, and his ability to . . . conduct depositions are not exceptional circumstances warranting the appointment of counsel . . . .") (citing *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986) (noting that "[i]f all that was required to establish successfully the complexity of the relevant issues was a demonstration of the need for development of further facts, practically all cases would involve complex legal issues")). Nonetheless, the docket demonstrates the Court's repeated attempts to resolve the matter through use of a magistrate judge. (*See, e.g.*, Dkt. Nos. 13–16, 21, 95.) Despite the use of considerable resources, the issues could not be resolved. Having now reviewed all of the evidence, plaintiff's various requests for appointment of counsel are **DENIED** in light of the Court's rulings herein. To the extent plaintiff complains about the quality of her representation in her state criminal proceedings, (*see, e.g.*, MSJ Suppl. Opp. Pt. 1 at 11), that issue is not properly before the Court, and the Court thus does not consider it.

The following causes of action, now before the Court on the City Defendants' Motion for Judgment on the Pleadings and Motion for Summary Judgment, remain: (i) violation of California Civil Code section 52.1 against all City Defendants; (ii) intentional infliction of emotional distress against all City Defendants; (iii) negligence against all City Defendants; (iv) negligence per se against the Officer Defendants only; (v) negligent selection, training, retention, supervision, investigation, and discipline against the City and Schwedhelm only; (vi) respondeat superior against the City only; (vii) Section 1983 claims against all City Defendants; (viii) Section 1985 claims against all City Defendants; (ix) a claim for injunctive and declaratory relief against the City only; (x) false imprisonment or false arrest against all City Defendants except for Schwedhelm; (xi) conspiracy against all City Defendants; and (x) slander per se against all City Defendants.[13]  The City Defendants seek summary judgment as to: (i) all claims against Schwedhelm; and (ii) plaintiff's Section 1983 claims against Officer Deadman and Sgt. Romero. They seek judgment on the pleadings as to (i) all claims against Schwedhelm; and (ii) all remaining claims not addressed in their motion for summary judgment.

**III.    CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of offering proof of the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party's burden is met, the party opposing the motion is required to go beyond the pleadings and, by the party's own affidavits or by other evidence, designate "specific facts showing that there is a genuine issue for trial."  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  The party opposing the motion must submit evidence sufficient to establish the elements that are essential to that party's case, and for which that party will bear the burden of proof at trial.

---

[13] Plaintiff continues to raise issues pertaining to a social security number, which she believes has been incorrectly attached to her in certain records.  (*See, e.g.,* MSJ Suppl. Opp. Pt. 2 at 22.)  However, the Court can discern no relationship between these issues and her claims against the City Defendants and thus does not address them.

*Celotex*, 477 U.S. at 322.

The court must "view the facts in the light most favorable to the non-moving party and draw reasonable inferences in favor of that party." *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007). Where different ultimate inferences can be drawn from the undisputed facts, summary judgment is inappropriate. *Miller*, 454 F.3d at 988. "At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

A factual dispute is "genuine" only if there is a sufficient evidentiary basis upon which a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A factual dispute is "material" only if it might affect the outcome of the lawsuit under the governing law. *Id*. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

It is not the Court's task to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks omitted). Moreover, mere argument in a legal brief is insufficient to create a genuine issue of material fact. *See S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982) ("[A] party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."). Rather, the adverse party has an obligation to lay out its support clearly, and the Court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).[14]

---

[14] In connection with their Motion for Summary Judgment, the City Defendants' request that the Court take judicial notice of plaintiff's TAC and the City Defendants' answer to the same. (*See* Dkt. No. 154.) As previously explained, the Court need not take judicial notice of documents on this case's docket. The request is thus **DENIED**.

## A.  Section 1983 Unlawful Arrest Claim Against Sgt. Romero

The City Defendants argue for summary judgment on plaintiff's unlawful arrest claim against Sgt. Romero on the grounds that (i) plaintiff suffered no constitutional violation because probable cause existed to support an arrest, and (ii) even if a constitutional violation did occur, Sgt. Romero is entitled to qualified immunity.[15]  Plaintiff counters that the arrest was unlawful because she had committed no crime.  (*See* MSJ Opp. Pt. 2 at 8.)

### 1.  Legal Background

The Fourth Amendment protects "against unreasonable searches and seizures."  U.S. Const. amend. IV.  Liability for damages under Section 1983 arises only upon a showing of personal participation by the defendant.  *Starr v. Baca*, 652 F.3d 1202, 1221 (9th Cir. 2011).

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The first prong asks whether the facts, "'[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'"  *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (alterations in original).  "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation."  *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.  This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case.  *Id.* at 201.  "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."  *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).

---

[15]  While the City Defendants refer to the qualified immunity point in the heading of the relevant portion of their brief and explain the legal standard, there is no further elaboration on this point.  (*See* MSJ at 11–14.)

Where a dispute exists in the underlying evidence, qualified immunity cannot be granted.

*Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003).

It is well-established that "an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983." *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988). An officer who makes an arrest without probable cause, however, may still be entitled to qualified immunity if he reasonably *believed* there to have been probable cause. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009). "In the context of an unlawful arrest, then, the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for the arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (emphasis in original).

### 2. *Discussion*

Plaintiff's arrest was lawful if Sgt. Romero had probable cause to believe plaintiff had committed a crime. *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999). "Probable cause exists when, under the totality of the circumstances known to the arresting officers . . . a prudent person would believe the suspect had committed a crime." *Dubner v. City & Cty. of S.F.*, 266 F.3d 959, 966 (9th Cir. 2001).

In California, it is unlawful for a person to "intentionally interfer[e] with any lawful business carried on by the employees of a public agency open to the public, by obstructing or intimidating those attempting to carry on business . . . and [to] refuse[] to leave the premises of the public agency after being requested to leave . . . ." Cal. Pen. Code. § 602.1(b). "Thus, a violation of § 602.1 has two elements: (1) intentional interference, and (2) refusal to leave." *Dubner*, 266 F.3d at 966.[16] It is also unlawful in California to "willfully resist[], delay[], or obstruct[]" a peace

---

[16] While *Dubner* discussed Penal Code section 602.1 generally, it is worth noting that section 602.1(a) was actually at issue in that case, while section 602.1(b) is at issue here. The operative language of the two subsections is identical, the only difference between them being that subsection (a) pertains to private businesses and subsection (b) deals with public agencies. Here, plaintiff contends that she was never asked to leave the station. (*See, e.g.*, Weiss Depo Tr. at 111:21–112:2.) Sgt. Romero's version of the events is that he warned plaintiff twice: (1) first, he

officer "in the discharge or attempt to discharge any duty of his or her office or employment[.]" Cal. Pen. Code § 148(a)(1). For a conviction under section 148(a)(1) to be valid, the defendant must have resisted, delayed, or obstructed a police officer in the "lawful exercise of his or her duties." *Hooper v. Cty. of San Diego*, 629 F.3d 1127, 1130 (9th Cir. 2011).

With respect to Penal Code section 602.1(b), it is undisputed that plaintiff called the Dispatch Center three times within a one-hour period and that plaintiff's three calls to Dispatch were not emergencies as they pertained to a non-emergency matter, namely obtaining a police report regarding the Comcast incident. These calls interfered with police operations as Dispatch call-takers had to be pulled away from their duties of handling 911 emergency calls for service. (Romero Decl. ¶ 4.) Due to the disruption, call-takers contacted Sgt. Romero to report plaintiff's repeated calls. (*Id.* ¶¶ 8, 14.)

Plaintiff disputes that she "interfered with any police or dispatch business." (MSJ Opp. Pt. 2 at 13.) "In fact," plaintiff argues, "she was told on numerous occasions she was welcome to sit down and wait by both the 'police dispatch & Sgt. Romero.'" (*Id.* (emphasis omitted).)[17] In support of this proposition, plaintiff cites an unauthenticated document which purports to be a Dispatch call log.[18] Nevertheless, even had the call log been properly authenticated, it would be

---

told her that she could talk to Officer Deadman or leave the station; and (2) second, he told her that she could leave the station immediately or be arrested. (*See* Romero Decl. ¶¶ 15, 18.) The video evidence does not support plaintiff's assertion, and therefore the Court finds that plaintiff does not create a disputed material fact with her testimony.

[17] Plaintiff's reliance on *People v. Jones*, 9 N.Y.3d 259 (2007) to argue that she had a "right to hang around," (MSJ Suppl. Opp. Pt. 2 at 10), is unavailing. There, the Court of Appeals of New York addressed "the jurisdictional sufficiency of an information charging disorderly conduct" under N.Y. Penal Law § 240.20(5). *Id.* at 260. That New York state law provision is, for obvious reasons, not at issue here. Nor did the court in *Jones*, as plaintiff contends, "confirm[] the right to hang around." (MSJ Suppl. Opp. Pt. 2 at 10.) Rather, the court found that the allegations in the information at issue did not meet the burden to "set forth a prima facie case that defendant 'with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . osbstruct[ed] vehicular or pedestrian traffic.'" *Jones*, 9 N.Y.3d at 262 (quoting section 240.20(5)) (alterations in original); *see also id.* ("Something more than a mere inconvenience of pedestrians is required to support the charge . . . .").

[18] "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what its proponent claims it is." Fed. R. Evid. 901(a). A proper foundation can be established through an affidavit made on personal knowledge that meets the requirements of Federal Rule of Civil Procedure 56(c). *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002); Fed. R. Civ. P. 56(c).

insufficient to create a genuine issue of material fact. Namely, the call log supports a finding of disruption: It shows plaintiff being told by a dispatcher that the "Records" department was closed for the day and that dispatchers "take over 300 events a day." (Dkt. No. 163-2 at ECF p. 3.)[19] The dispatcher further explained to plaintiff that the three officers with whom plaintiff wanted to speak—Officers Deadman, Kemp, and Gillette—were all "on calls" and that the dispatcher could not "take them off their call[s]." (*Id* at ECF p. 4.) If plaintiff wanted to speak with the officers, it was "gonna be a while" but it was "completely up to [plaintiff]" if she wanted to wait. (*Id*.) After getting off the phone with plaintiff, the dispatcher expressed to an unidentified male caller that plaintiff was "calling us every ten minutes . . . ." (*Id*. at ECF p. 6.)

During Romero's first encounter with plaintiff, which took place after plaintiff's first call to Dispatch, he told plaintiff that she would have to wait to speak to the officers involved in the Comcast incident and that they would be in when time permitted. (Romero Decl. ¶ 12.) According to plaintiff, Sgt. Romero told her that she "might have to wait all night," presumably because the three officers were preoccupied with higher-priority police responsibilities. (MSJ Opp. Pt. 2 at 9.) Plaintiff nevertheless chose to stay at the police station rather than return during regular business hours.

No one suggests these initial interactions with Dispatch and Sgt. Romero created any issue or that plaintiff was not initially given "[p]ermission to [s]tay & [w]ait." (MSJ Suppl. Opp. Pt. 2 at 20.) However, the situation did not remain static. Plaintiff does not dispute that she refused the *subsequent* opportunity that Sgt. Romero gave her to speak with Officer Deadman about the Comcast incident or that she was intent on staying at the SRPD station until she could speak with all of the officers who had been present at Comcast. It is also undisputed that plaintiff reached for

---

Alternatively, documentary evidence can be authenticated under Federal Rule of Civil Procedure 901(b)(1) by a witness who wrote it, signed it, or saw others do so; or as a self-authenticating document under Federal Rule of Evidence 902. *See Orr*, 285 F.3d at 774; *accord SEC v. Phan*, 500 F.3d 895, 913 (9th Cir. 2007); Fed. R. Evid. 901(b); Fed. R. Evid. 902. "It is insufficient for a litigant to merely attach a document to a summary judgment motion or opposition without affirmatively demonstrating its authenticity." *Randazza v. Cox*, No. 2:12-cv-2040-JAD-PAL, 2014 WL 1407378, at *3 (D. Nev. Apr. 10, 2014).

[19] It appears that certain pages from the call log, namely pages 3 and 7, have been omitted.

the lobby phone for a fourth time after refusing to speak to Officer Deadman. The Court finds that these actions evince a clear refusal by plaintiff to leave the SRPD station and plaintiff's intention to continue to contact Dispatch.

In sum, plaintiff's disruptive behavior in the approximately one hour leading up to her arrest reasonably led Sgt. Romero to believe that plaintiff would continue her disruptive behavior (*i.e.*, using the lobby phone for non-emergency calls) if she did not leave the property. Plaintiff's subjective, self-serving opinion that "it [is] hard to believe" that her actions "impair[ed] the Police Department's ability to perform their job" is irrelevant here. (MSJ Opp. Pt. 2 at 13.) Sgt. Romero reasonably concluded that plaintiff had violated Penal Code section 602.1(b). *See Buckner*, 179 F.3d at 837. Thus, Sgt. Romero had probable cause to arrest plaintiff under section 602.1(b), and the arrest based on violation of the same did not violate plaintiff's rights under the Fourth Amendment.

As for Penal Code section 148(a)(1), it is undisputed that after plaintiff grabbed the lobby phone for a fourth time, she resisted Sgt. Romero and Officer Deadman. (*See* Romero Decl. ¶¶ 21–23; Police fl1 CO4 at 23:37:36–38.)[20] Plaintiff admits that she was told to "Quit Resisting Arrest." (TAC ¶ 52.) Instead of complying with Sgt. Romero's order, plaintiff pulled completely free from Sgt. Romero's hands, turned to face him, and continued to move away from him. (Romero Decl. ¶ 22; Police fl1 CO4 at 23:37:36–38.) As plaintiff continued to pull away from Sgt. Romero, he was able to grasp her right wrist with his left hand, and then Officer Deadman grasped plaintiff's right shoulder. (Romero Decl. ¶ 23; Police fl1 CO4 at 23:37:36–38.)

Given plaintiff's resistance to arrest, probable cause existed to arrest her for violating Penal Code section 148(a)(1). Plaintiff's arrest based on violation of the same thus did not violate her rights under the Fourth Amendment.[21]

---

[20] Plaintiff's contention that "[t]here was no resistance by [her],"(MSJ Opp. Pt. 2 at 8), is contradicted by the video evidence. *See Scott v. Harris*, 550 U.S 372, 378–80 (2007) (holding that when a video clearly contradicts one party's version of the events, the court should not accept that version).

[21] Plaintiff argues that the fact that the charges were later dropped against her refutes the existence of probable cause. However, the fact that the charges were dropped does not negate the

16

Accordingly, the City Defendants' Motion for Summary Judgment as to plaintiff's Section 1983 claim for unlawful arrest against Sgt. Romero is **GRANTED**.[22]

**B.     Section 1983 Excessive Force Claim Against Sgt. Romero and Officer Deadman**

The City Defendants argue for summary judgment on plaintiff's excessive force claim against Sgt. Romero and Officer Deadman on the grounds that (i) neither Sgt. Romero nor Officer Deadman used excessive force, and (ii) even if excessive force was used, Sgt. Romero and Officer Deadman are entitled to qualified immunity. Plaintiff maintains that she was subjected to excessive force at the hands of Sgt. Romero and Officer Deadman when she was "jumped in the police lobby, slammed up against various walls, [and] thrown on the ground . . . ." (MTD Opp at 8.)[23]

---

existence of probable cause. *See Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995) ("[T]he mere fact a prosecution was unsuccessful does not mean it was not supported by probable cause.").

[22]     While the Court need not reach the issue, even if Sgt. Romero's arrest of plaintiff lacked probable cause, Sgt. Romero would be entitled to qualified immunity. *See, e.g., Blankenhorn v. City of Orange*, 485 F.3d 463, 476 (9th Cir. 2007) ("Even if a trespassing conviction ultimately might have been difficult, there was no clearly stablished law indicating that Blankenhorn could not have been trespassing under present circumstances. Accordingly, even if there were no probable cause (or there were a triable question of fact), the Defendants would still be entitled to qualified immunity."). In this case, the second prong of the qualified immunity inquiry calls for the Court to determine "whether a reasonable officer could have believed that probable cause existed to arrest the plaintiff." *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir. 2002) (internal quotation marks omitted). In light of the multiple calls placed by plaintiff to the Dispatch Center, and the undisputed facts that plaintiff refused to speak to Officer Deadman about the Comcast incident, reached for the phone a fourth time instead of leaving the premises, and did not comply with Sgt. Romero's order to stop resisting arrest, a reasonable officer could have believed probable cause existed to arrest plaintiff.

[23]     To the extent plaintiff alleges excessive force against Officer Deadman relating to the Comcast incident (*see* TAC ¶ 50; MSJ Suppl. Opp. Pt. 2 at 12), the Court agrees with the City Defendants that those allegations are time-barred. (*See* Dkt. No. 168.) As the Comcast incident occurred on July 24, 2013, the last day for plaintiff to have amended the pleadings timely was July 24, 2015. However, plaintiff for the first time pleaded allegations of excessive force against Officer Deadman on November 19, 2015, in her SAC. (*See* SAC ¶¶ 36, 37.) Because the Comcast incident does not rest on the same general set of facts as the incident at the SRPD, it does not relate back to plaintiff's original complaint filed on September 12, 2014. (*See* Compl. at ECF p. 7 ("Claimant (Terry Weiss) had gone to Santa Rosa Police Dept to obtain a report, leave her name, contact info, and speak to officer's [*sic*] involved in an earlier incident involving Comcast.").)

### 1.    Legal Background

Claims against law enforcement officers for the use of excessive force during an arrest are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001). The relevant question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation." *Graham*, 490 U.S. at 397. Making this determination requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (internal quotation marks omitted). In other words, "the type and amount of force inflicted" must be evaluated and weighed against such factors as "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) (citing *Graham*, 490 U.S. at 396); *see also Jackson*, 268 F.3d at 651–52. "Reasonableness is viewed from the perspective of an officer on the scene, and without the benefit of 20/20 hindsight, as 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Lucero v. Ettare*, No. 15-cv-02654-KAW, 2016 WL 3924189, at *4 (N.D. Cal. July 21, 2016) (quoting *Graham*, 490 U.S. at 396).

As stated previously, if a court determines that the alleged conduct violates a clearly established constitutional right, the second step is "to inquire whether the officer was reasonable in his belief that his conduct did not violate the Constitution." *Wilkins*, 350 F.3d at 954–55.

### 2.    Discussion

Instead of speaking with Officer Deadman or leaving the station, plaintiff opted to grab the lobby phone for a fourth time. (Romero Decl. ¶ 19.) Plaintiff claims that Sgt. Romero "grab[bed] [her] throat & head." (MSJ Opp. Pt. 2 at 4.) The video evidence demonstrates otherwise. It shows that Sgt. Romero was reaching for the phone, which plaintiff was holding up against her

United States District Court
Northern District of California

left ear. (Police fl1 CO2 at 23:37:35–36.)[24] The video evidence further confirms that Sgt. Romero and Officer Deadman used a firm grip to subdue plaintiff after she resisted Sgt. Romero and pulled away from him. (Police fl1 CO4 at 23:37:36–39; Police fl1 CO1 at 23:38:01.) "[U]niform presence" and "firm grip" are low levels of force under the SRPD Policy Manual. (*See* Fristch Decl. Exh. J ("Policy Manual") Policy 300.1.3(a), Dkt. No. 151-3.) Plaintiff admits that Sgt. Romero and Officer Deadman told her to "Quit Resisting Arrest." (TAC ¶ 52.) Pursuant to the Policy Manual, verbal commands constitute low levels of force. (Policy Manual, Policy 300.1.3(a).) As for plaintiff's allegation that she was "Slamm[ed] . . . Up Against the Walls, Counter, [and] Glass," (TAC ¶ 52), the video evidence shows plaintiff in momentary contact with a wall and counter while being controlled and handcuffed. (Police fl1 CO1 at 23:38:01.) However, moments before, plaintiff had freed herself from Sgt. Romero's grasp and moved away from him, so plaintiff's resistance had to be overcome to bring her under control. The Court concludes that no reasonable jury would find Sgt. Romero's and Officer Deadman's decision to use force, or the amount of force employed, unreasonable under these circumstances.[25] They used a normal and justified means of arrest.

Separate from the arrest in the SRPD lobby, plaintiff alleges that, in the rear parking lot of the SRPD, she was "slammed against the trunk & door, of Police Car Pulling Ms Weiss Hand Cuffed Arms Backwards & Upwards injuring them, before Shoving her Harshly in the backseat." (TAC ¶ 52; *see also, e.g.*, Weiss Depo Tr. at 17:23–18:1.)[26] She testified at her deposition that she was injured as a result of this contact, namely:

> I believe there is not a single part of my face that did not swell up. I believe my whole face is swollen, and I believe my eyes, by the different levels of my eyebrows and the swollenness that goes over my eyelids and the puffiness on the

---

[24] Plaintiff offers no evidence that Sgt. Romero's contact with her neck and head, if he indeed contacted plaintiff's neck and head, was anything more than incidental to his action of taking plaintiff into custody.

[25] By contrast, plaintiff's insistence on speaking to all of the officers involved in the Comcast incident is not a reasonable posture.

[26] The City Defendants indicate that there is no surveillance system of the SRPD parking lot for patrol cars at the back of the building. (Petri Decl. ¶ 10.)

side of my cheeks, I believe to me that is sufficient enough to prove here that my whole face made contact.

(Weiss Depo Tr. at 53:6–12.) Plaintiff also testified that her shoulder was injured. (*Id.* at 17:23–18:1.) She apparently saw a doctor and physical therapist within a week or two of the incident. (*Id.* at 92:21–93:19.) However, the booking photograph taken at the county jail contradicts plaintiff's testimony and shows no visible sign that plaintiff suffered any significant injury.[27] (*See* Booking Photograph.) Further, plaintiff has proffered no evidence of injury, such as medical records or other photographs, to support her claim.[28]

By contrast, records reflect that plaintiff was examined by CD Flores approximately 45 minutes after she was arrested. CD Flores recorded his objective observations to ensure that arrestees were not admitted into the MADF without a medical clearance from the hospital. If arrestees displayed "visible or obvious symptoms of a head injury" or "complain[ed] of or demonstrat[ed] symptoms of severe pain or trauma," "the arresting/transporting officer [was] required to take the individual to an emergency medical facility for evaluation, examination and treatment as necessary." (Arrest Report Form; *see also* Flores Depo Tr. at 10:15–11:4, 32:12–34:1.) CD Flores did not observe any evidence of any head or other injury during his examination of plaintiff.[29]

Given the contemporaneous documentation in the record, at most, the Court could infer

_____

[27] The Court notes that the booking photograph suggests minor swelling of plaintiff's right eyelid. (*See* Weiss Depo Tr. Exh. No. 4 ("Booking Photograph"), Dkt. No. 167-2; *see also* Weiss Depo Tr. at 16:5–17:10.) However, even assuming that to be the case, it does not amount to significant injury which required immediate medical attention.

To the extent plaintiff claims she was injured because her handcuffs were on too tight, this claim of injury is also "unsupported as [plaintiff] does not provide any medical records to support her claim that she suffered injury as a result of being handcuffed." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001).

[28] Plaintiff has also produced no evidence that she incurred any medical expenses in connection with her purported injuries.

[29] While CD Flores indicated in the Pre-Booking Medical/Mental Health Screening Form that plaintiff suffered from a toothache, high blood pressure, and back and neck injuries, this information is based, not on CD Flores' objective assessment, but on plaintiff's subjective evaluation. (*See* Fristch Decl. Exh. H at ECF p. 26; Flores Depo Tr. at 30:20–31:6.) As explained above, plaintiff has offered no evidence to substantiate the latter.

minor injuries.[30]  Accordingly, the Court can similarly "infer from the minor nature of [plaintiff's] injuries that the force applied was minimal."  *Felarca v. Birgenau*, 891 F.3d 809, 817 (9th Cir. 2018).  "While injuries are not a precondition to section 1983 liability, their absence can suggest a lesser degree of force when that force is of the type likely to cause injuries."  *Id.* (citing *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002); *Robinson v. Solano Cty.*, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc)).  One would generally expect injuries from being "slammed several times" against a car while having one's hands "yank[ed] . . . upwards."  (Weiss Depo Tr. at 17:24; 22:8–9.)  But here, there is no objective evidence that plaintiff suffered injuries from Sgt. Romero's or Officer Deadman's alleged use of force that required an immediate medical evaluation, examination, or treatment.  Plaintiff has failed to disclose the identity of any health care provider or other witness to support her allegations of injury and has failed to produce any documentary support for such allegations.  The ample opportunities and time plaintiff has had to offer evidence together with the balance of the record before the Court indicate that, even if the force used was of a type that is generally intrusive, the amount of force applied here was minimal.[31]

The government, on the other hand, has a legitimate interest in preventing any obstruction to the SRPD's Dispatch Center's function since the Dispatch Center is critical to the communication and deployment of field officers in carrying out their daily police operations.  The Court can reasonably infer that a disruption to the Dispatch Center's function can jeopardize the efficiency of daily police operations, which in turn can jeopardize citizens and officers alike in emergency situations.  It is undisputed that plaintiff called Dispatch three times in one hour and talked to call-takers for an aggregate amount of time of over eleven minutes about a non-emergency situation.  Plaintiff also consumed over eleven minutes of Sgt. Romero's time during the hour.  Sgt. Romero offered to accommodate plaintiff's demands by making Officer Deadman

---

[30]  *See supra* n.27.

[31]  The Court acknowledges that the Officer Defendants may in fact have mishandled plaintiff and been disrespectful towards her.  (*See supra* n.27; *see also* Weiss Depo Tr. at 61:9–20, 107:3–7, 111:10–113:23.)  However, "[n]ot every push or shove . . . violates the Fourth Amendment," *Graham*, 490 U.S. at 396 (internal quotation marks omitted), nor does Section 1983 provide redress for verbal harassment, *see Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979).

1    available to her for questioning, but plaintiff refused to speak to Officer Deadman without Officers

2    Kemp and Gillette also being present.  Instead, plaintiff attempted to call Dispatch for a fourth

3    time.

4        Under these circumstances, the government had a legitimate interest in applying minimal

5    force to prevent further disruption to the Dispatch Center and the deployment of field officers.

6    Accordingly, the City Defendants' Motion for Summary Judgment as to plaintiff's Section 1983

7    claim for excessive force against Sgt. Romero and Officer Deadman is **GRANTED**.

8        **C.    Section 1983 Claim Against the City**

9        In light of the Court's ruling that there was no underlying constitutional violation, plaintiff

10   cannot maintain a claim for municipal liability.  *See Quintanilla v. City of Downey*, 84 F.3d 353,

11   355 (9th Cir. 1996) ("[A] public entity is not liable for § 1983 damages under a policy that can

12   cause constitutional deprivations, when the factfinder concludes that an individual officer, acting

13   pursuant to the policy, inflicted no constitutional harm to the plaintiff."); *see also, e.g., Simmons v.*

14   *Navajo Cty., Ariz.*, 609 F.3d 1011, 1021 (9th Cir. 2010) ("Because we hold that there was no

15   underlying constitutional violation, the [plaintiffs] cannot maintain a claim for municipal

16   liability.").  Accordingly, this claim fails as a matter of law.

17       **D.    Conclusion**

18       In sum, the Court has given due consideration to the record before it.  The Court does not

19   deny that an altercation took place, which may have caused plaintiff to suffer minor injuries and

20   verbal indignity.  However, not every wrong or discomfort inflicted on a person gives rise to a

21   constitutional violation.  While the Court can sympathize with plaintiff's plight, it can only

22   address wrongs of a genuinely constitutional nature and significance.  Stated simply, no such

23   wrong exists here.

24   **IV.    CITY DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

25       "After the pleadings are closed—but early enough not to delay trial—a party may move for

26   judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Granting a judgment on the pleadings is

27   proper when, "taking all the allegations in the pleadings as true, the moving party is entitled to

28   judgment as a matter of law."  *Gregg v. Haw., Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir.

2017) (quoting *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998)). "[A] Rule 12(c) motion is functionally identical to a Rule 12(b)(6) motion . . . ." *Id*. (internal quotation marks omitted).

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008); *see also* Fed. R. Civ. P. 8(a) (requiring that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

In light of the Court's rulings on the City Defendants' Motion for Summary Judgment, the claims that remain, as the Court understands them, are the following:

- Violation of California Civil Code section 52.1 against all City Defendants;
- Intentional infliction of emotional distress against all City Defendants;
- Negligence against all City Defendants;
- Negligence per se against the Officer Defendants only;
- Negligent selection, training, retention, supervision, investigation, and discipline against the City and Schwedhelm only
- Respondeat superior against the City only;
- Section 1983 claims against Schwedhelm, Officer Kemp, and Officer Gillette;
- Section 1985 claims against all City Defendants;

- Injunctive and declaratory relief against the City only;
- False imprisonment or false arrest against all City Defendants except for Schwedhelm;[32]
- Conspiracy against all City Defendants; and
- Slander per se against all City Defendants.

The City Defendants make a host of arguments as to why these remaining claims should be dismissed with prejudice. The Court addresses each in turn.

### A. Whether the state law tort claims as to all City Defendants should be dismissed with prejudice.

The California Tort Claims Act ("TCA") requires a party seeking to recover money damages from a public entity or its employees to submit a timely claim to the entity before filing suit in court. *See* Cal. Gov't Code §§ 905, 911.2, 945.4, 950.2. Specifically, "[a] claim under the TCA must be submitted to the public entity within six months of the accrual of the plaintiff's cause of action." *Via v. City of Fairfield*, 833 F. Supp. 2d 1189, 1197 (E.D. Cal. 2011) (citing Cal Gov't Code § 911.2(a)). Timely presentation of claims subject to the TCA is not merely a procedural requirement but is an element of the plaintiff's cause of action. *Shirk v. Vista Unified Sch. Dist.*, 64 Cal. Rptr. 3d 210, 216 (2007), *as modified* (Oct. 10. 2007). "If a claim is rejected, the public entity must provide written notice, and if such notice is provided in accordance with the statute, a plaintiff wishing to file a lawsuit must do so 'not later than six months after the date such notice is personally delivered or deposited in the mail.'" *L.S. v. City of Oakland*, No. C 09-03004 CW, 2009 WL 4705424, *2 (N.D. Cal. Dec. 2, 2009) (quoting Cal. Gov. Code § 945.6(a)(1)). A plaintiff asserting a claim that is subject to the TCA must allege compliance with the TCA in his or her complaint. *AIDS Healthcare Found. v. L.A. Cty.*, No. CV 12-10400 PA (AGRx), 2013 WL 12134048, at *9 (C.D. Cal. Mar. 18, 2013).

Plaintiff does not plead compliance with the TCA, nor can she with respect to her claims

---

[32] The Court notes that "[t]he tort of false imprisonment and false arrest are considered one in the same, because false arrest is but one way of committing a false imprisonment." *Martin v. Cty. of San Diego*, 650 F. Supp. 2d 1094, 1105 (S.D. Cal. 2009) (internal quotation marks omitted).

for:

- Violation of Civil Code section 52.1;

- Intentional infliction of emotional distress;

- Negligence as asserted against the Individual City Defendants;

- Negligence per se;

- Negligent selection, training, retention, supervision, investigation, and discipline;

- Respondeat superior;

- False imprisonment / false arrest;

- Conspiracy; and

- Slander per se.

On March 14, 2014, the City officially rejected plaintiff's claim for "general negligence" against the SRPD and deposited the rejection letter in the mail on the same day. (*See* Rejection.) Plaintiff filed the initial complaint in this case on September 12, 2014, (*see* Compl.), but did not file her FAC adding Schwedhelm, and Officers Romero, Kemp, and Deadman as defendants until March 30, 2015, just over one year after the notice of rejection was mailed. As for Officer Gillette, plaintiff did not file her SAC adding him until December 15, 2015, approximately 21 months after the notice of rejection was deposited in the mail. Accordingly, the Court finds that these state law tort causes of action are time-barred, and the City Defendants' Motion for Judgment on the Pleadings is **GRANTED WITH PREJUDICE** as to these claims.

With respect to the City, the sole timely cause of action is "general negligence," and over one year elapsed between the mailing of the notice of rejection and when suit was filed as to all of the other state law causes of action. As to the sole timely cause of action, the City Defendants argue that the City lacks negligence liability "because no statutory basis for state law liability of [the City] is alleged." (MJP at 7.) The Court agrees.

California Government Code section 815 states that, "[e]xcept as otherwise provided by statute . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Cal. Gov't Code § 815(a). "Accordingly, public entities may be held liable only if a statute is found declaring them

to be liable." *Comm. for Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 1208 (N.D. Cal. 2009). "[A] public entity cannot be held liable for common law negligence." *McCarty v. Cal. Dep't of Transp.*, 164 Cal. App. 4th 955, 977 (2008). "[S]overeign immunity is the rule in California[, and] governmental liability is limited to exceptions specifically set forth by statute." *Cochran v. Herzog Engraving Co.*, 155 Cal. App. 3d 405, 409 (1984).

Here, plaintiff has asserted only a common law negligence claim against the City and has not identified any statutory basis for tort liability against the same. Plaintiff's general negligence claim against the City therefore fails. Given plaintiff's failure to oppose dismissal of this claim and the multiple opportunities she has had to amend her complaint, the City Defendants' Motion for Judgment on the Pleadings is **GRANTED WITH PREJUDICE** as to plaintiff's negligence claim against the City.

**B.      Whether the Section 1985 claim as to all City Defendants should be dismissed with prejudice.**

Section 1985 provides a cause of action against two or more individuals who "conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws[.]" 42 U.S.C. § 1985(3). "To state a claim for conspiracy to violate constitutional rights, 'the plaintiff must state specific facts to support the existence of the claimed conspiracy.'" *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 929 (9th Cir. 2004) (quoting *Burns v. Cty. of King*, 883 F.2d 819, 821 (9th Cir. 1989)). Additionally, "a plaintiff must demonstrate a deprivation of a right motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *RK Ventures, Inc. v. Seattle*, 307 F.3d 1045, 1056 (9th Cir. 2002) (internal quotation marks omitted).

The City Defendants argue that the TAC fails to state facts both to support the existence of a conspiracy and to demonstrate that the alleged deprivations were motived by racial or class-based animus. The Court agrees. The TAC includes numerous allegations of mistreatment committed by the City Defendants. However, plaintiff does not state any facts that would support a finding that the City Defendants were engaged in a conspiracy to deprive plaintiff of her

constitutional rights. Moreover, plaintiff fails to include any allegations that she belongs to a

protected class, and that she was targeted as a result of her membership in that protected class.

Accordingly, the City Defendants' Motion for Judgment on the Pleadings is **GRANTED** as

to plaintiffs' Section 1985 claim against the City Defendants. Because the Court put plaintiff on

notice of these deficiencies before, albeit in the context of the *County Defendants'* motions to

dismiss (*see* Dkt. Nos. 72, 86), the dismissal shall be **WITH PREJUDICE**.

> **C.**     **Whether the Section 1983 claim as to Officer Gillette should be dismissed with prejudice.**

The statute of limitations applicable to plaintiff's claims under Section 1983 is two years.

*See Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004) (noting that the statute of limitations for

Section 1983 claims is governed by the forum state's statute of limitations for personal injury

claims, which is two years under California law); *see also Maldonado v. Harris*, 370 F.3d 945,

954 (2004).

The TAC alleges that Gillette made a "rude comment[]" and was present when plaintiff

was "[b]rutalized" in the SRPD rear parking lot. (TAC ¶ 52.) As these events occurred on July

24, 2013, the statutory period expired two years later, on July 24, 2015. Plaintiff filed the SAC

naming Gillette for the first time approximately five months later, on December 15, 2015.

However, plaintiff filed her initial complaint in the Superior Court on September 12, 2014, which

would have been timely.

The question is thus whether plaintiff's claims in the SAC relate back to the initial

complaint. Although plaintiff does not argue relation back, especially given her *pro se* status, the

Court will consider it *sua sponte*. *See, e.g., Garland v. Lewis*, No. CV 10-9010 FMO (OPx), 2013

WL 4198278, at *2 (C.D. Cal. Aug. 12, 2013) (examining whether *pro se* plaintiff's claims related

back even though the plaintiff had only generally argued that his claims were not time-barred).

When a federal cause of action is brought under Section 1983, "the relation back provisions of

state law, rather than [Federal Rule of Civil Procedure] 15(c) govern . . . ." *Merritt v. Cty. of L.A.*,

875 F.2d 765, 768 (9th Cir. 1989). An amended complaint relates back to the original complaint

under California law if the amended complaint "(1) rest[s] on the *same general set of facts*, (2)

involve[s] the *same injury*, and (3) refer[s] to the *same instrumentality*, as the original one." *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 408–09 (1999) (emphases in original); *M.G. ex rel. Goodwin v. Cty. of Contra Costa*, No. C 11-04853 WHA, 2013 WL 706801, at *4 (N.D. Cal. Feb. 26, 2013) (same).

Stated differently, an amended complaint may "relate[] back to a timely filed original complaint, and thus avoid[] the bar of the statute of limitations, only if it rests on the same general set of facts and refers to the same offending instrumentalities, accident and injuries as the original complaint." *Davaloo v. State Farm Ins. Co.*, 135 Cal. App. 4th 409, 415 (2005) (internal quotation marks omitted). But even if an earlier complaint rests on the same set of facts, the amended complaint may not relate back unless "a reasonable defendant [would] have understood the [original] complaint to allege that it was in some way responsible for plaintiff's injury[.]" *Bell v. Tri-City Hosp. Dist.*, 196 Cal. App. 3d 438, 449 (1987), *disapproved of on other grounds*, *State of Cal. v. Superior Court*, 32 Cal. 4th 1234 (2004). "[T]he relation-back doctrine applies where a complaint sets forth, or attempts to set forth, a cause of action against a defendant designated by fictitious name and his true name is thereafter discovered and substituted by amendment . . . ." *Kralow Co. v. Sully-Miller Contracting Co.*, 168 Cal. App. 3d 1029, 1035 (1985) (internal quotation marks omitted). Thus, "[t]he relation-back doctrine is inapplicable . . . where [a plaintiff] attempts to relate back an amended [complaint] to a complaint which failed to name [defendant] or any Doe defendants." *Id.* at 1035–36; *see also Anderson v. Allstate Ins. Co.*, 630 F.2d 677, 683 (9th Cir. 1980) ("Under California law, if a defendant is added to an amended complaint as a new defendant, and not as a Doe defendant, the amendment does not relate back to the time of the original complaint.").

Plaintiff's timely-filed complaint before the Superior Court failed to name Officer Gillette or any Doe defendants. The Court recognizes that technical errors in the caption should not control over the substance of the complaint. *See Bell*, 196 Cal. App. 3d at 445. However, plaintiff refers to Officer Gillette by both name *and* badge number in the claim submitted to the City on January 28, 2014, so she cannot reasonably dispute that she knew Officer Gillette's identity on

that date and elected not to sue him. Accordingly, the relation back doctrine does not apply.[33]

The City Defendants' Motion for Judgment on the Pleadings is thus **GRANTED WITH PREJUDICE** as to plaintiff's Section 1983 claim against Officer Gillette.

### D. Whether the Section 1983 claim as to Schwedhelm should be dismissed with prejudice.

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent[.]" *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978). Thus, "[w]hen both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant." *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cty. Sheriff's Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).

The City Defendants argue that Schwedhelm is not subject to the TAC's Section 1983 claim in his official capacity. The Court agrees. The City is already named as a defendant in this action. Thus, plaintiff's Section 1983 claim against Schwedhelm, sued only in his official capacity (*see* TAC at 1), would be duplicative in practice. The City Defendants' Motion for Judgment on the Pleadings is therefore **GRANTED WITH PREJUDICE** as to plaintiff's Section 1983 claim against Schwedhelm.

### E. Whether the Section 1983 claim as to Officer Kemp should be dismissed with prejudice.

The TAC alleges that the Comcast manager "[went] into his office and call[ed] the police stating he thought there was going to be protesters at closing time . . . ." (TAC ¶ 49.) With respect to Officer Kemp specifically, it alleges that: (i) "Kemp (rookie) approach[ed] Ms. Weiss in an intimidating hostile manner, standing over Ms. Weiss sitting in a chair" at the Comcast retail store, (TAC ¶ 49); (ii) "officer Kemp (rookie, #479) would replace K-9 officer Gillette for transportation," (*id*. ¶ 52); and (iii) plaintiff "Endure[d] Extremely Rude Comments (some sexual),

---

[33] In light of the Court's finding that the relation back doctrine does not apply, it need not consider whether the facts, injury, and instrumentality were sufficiently analogous to support relation back of the complaint.

along with Rude Gestures and Behavior as well as being made Brunt of Officer's Jokes and Laughter," (*id.* ¶ 53). The City Defendants argue that the Section 1983 and 1985 claims against Officer Kemp should be dismissed with prejudice because the TAC's allegations fail to show that Officer Kemp used unreasonable force or violated any constitutional right. The Court agrees.

Approaching plaintiff in the context of responding to a call for service that there may be "protestors at closing time" does not rise to the level of an unreasonable use of force or other constitutional violation. TAC ¶ 49; *see Jackson v. Hurley*, No. C 91-2170 BAC, 1993 WL 515688 (N.D. Cal. Nov. 24, 1993) ("The alleged intimidation practiced on plaintiff was solely in the form of threats and verbal abuse. While the defendants' behavior may have annoyed and daunted plaintiff, it did not result in the kind of harm against which the constitution is designed to protect."); *see also Miller v. City of Goldendale*, No. 13-CV-00149-JTR, 2013 WL 6181185, at *3 (E.D. Wash. Nov. 26, 2013) ("Plaintiff's allegations of threats and intimidation do not rise to the level of a constitutional violation."). Further, even assuming that Officer Kemp made rude comments, Section 1983 does not provide redress for every rude or insensitive comment that police officers make to arrestees. *See Collins*, 603 F.2d at 827 (holding that "[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983"); *see also Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) ("Name calling is not a constitutional violation."). While such comments, to the extent they were made, may have been unnecessary, unprofessional, and inappropriate, this type of verbal harassment is simply not actionable as a *constitutional* violation.

Accordingly, the City Defendants' Motion for Judgment on the Pleadings is **GRANTED WITH PREJUDICE** as to plaintiff's Section 1983 claim against Officer Kemp.

**F.      Whether the claim for injunctive and declaratory relief against the City should be dismissed with prejudice.**

Because plaintiff's claims against the City are without merit, her claim for injunctive and declaratory relief against the City also fails.

\\

\\

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** the City Defendants' Motion to Dismiss, **GRANTS** their Motion for Summary Judgment as to plaintiff's Section 1983 claim against the City, Officer Deadman, and Sgt. Romero, and **GRANTS** their Motion for Judgment on the Pleadings as to all remaining claims.

This Order terminates Docket Numbers 137, 144, 145, and 148.

**IT IS SO ORDERED.**

Dated: December 11, 2018

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**